# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Apple Inc., One Apple Park Way,<br>Cupertino, California 95014,<br>Host of Apple ID gil.pimentel0215@icloud.com | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No.     '22 MJ02013 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. sec. 952, 960 | Importation of controlled substances |
| 21 U.S.C. sec. 963 | Conspiracy to import controlled substances |

The application is based on these facts:

See attached Affidavit of Special Agent Richard Horrocks.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of \_\_\_\_\_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Richard Horrocks*
_____
*Applicant's signature*

Special Agent Richard Horrocks, HSI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: \_\_\_\_ 06/03/2022 \_\_\_\_

_____
*Judge's signature*

City and state:  San Diego, California

Hon. Michael S. Berg, U.S. Magistrate Judge
_____
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEACH WARRANT**

I, Richard Horrocks, being duly sworn, declare and state:

1. I make this affidavit in support of an application for a search warrant to require Apple Inc. ("Apple") to disclose to the government records and other information, including the contents of communications, associated with Apple ID **gil.pimentel0215@icloud.com** (the "Subject Account") that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at One Apple Park Way, Cupertino, California 95014. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B, which are attached hereto and incorporated herein.

2. I submit that the facts contained herein demonstrate probable cause to believe that the fruits, instrumentalities, and evidence of violations of Title 21, United States Code, Sections 952, 960, and 963 (importation of and conspiracy to import controlled substances) by Gildardo PIMENTEL ("PIMENTEL" or "Defendant") and co-conspirators are located in the Subject Account, and I seek authorization to search for and to seize the information identified in Attachment B, incorporated herein, for the period of **December 1, 2021 to January 31, 2022**.

3. The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the Subject Account, it does not contain all the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause. All dates and times are approximate.

**EXPERIENCE AND TRAINING**

4. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7).

1

5.     I have been employed as a Special Agent with Homeland Security Investigations (HSI) since December 2020 where I am currently assigned to the HSI Office of the Assistant Special Agent in Charge, in Calexico, California. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC) and the Homeland Security Investigations Special Agent Training Program in Glynco, Georgia.

6.     Prior to my present assignment, I worked as an Immigration Services Officer with United States Citizenship and Immigration Services. I completed a bachelor's degree in Biological Systems Engineering and a minor in Spanish from the University of Nebraska-Lincoln.

7.     Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry.

8.     Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I submit this Affidavit in support of the application to search the Subject Account for and to seize, as they pertain to violations of law as described above and herein:

    a.     Communications, records, and attachments tending to discuss or establish the importation of or conspiracy to import fentanyl, methamphetamine, or other controlled substances, or the distribution of or conspiracy to distribute controlled substances;

    b.     Logs, images, videos, application data, iCloud data, histories, contact or friend lists, profiles, payment and billing records, backup and transactional data, and any other communications, records, and attachments, tending to discuss or establish the importation of or conspiracy to import fentanyl, methamphetamine, or other controlled substances, or the distribution of or conspiracy to distribute controlled substances;

2

c.   Communications, records, and attachments tending to identify any co-conspirators involved in the activities described above; and

d.   Communications, records, and attachments that provide context to any communications described above, such as messages or electronic mail sent or received in temporal proximity to any relevant message or electronic mail and any message or electronic mail tending to identify users of the subject accounts;

as described in Attachments A and B, incorporated herein.

## STATEMENT OF PROBABLE CAUSE

9.   PIMENTEL was arrested after approximately 250 pounds of narcotics were found in his car as he drove it into the United States. On January 31, 2022, at approximately 7:37 a.m., Customs and Border Protection Officer ("CBPO") Nieves was assigned to vehicle primary lane number 6. CBPO Nieves encountered Gildardo PIMENTEL, the driver, sole occupant, and registered owner of a red 2014 Ram 1500 truck ("the vehicle"). PIMENTEL, a lawful permanent resident, provided a negative customs declaration. PIMENTEL told CBPO Nieves that he lives in Mexicali and was going to Las Vegas, NV, for work. CBPO Nieves inspected the gas tank and noticed that, when tapped, the tank sounded solid and hard. CBPO Nieves referred PIMENTEL to secondary for a more in-depth inspection.

10.   A CBPO operating the Z-Portal machine detected anomalies in the gas tank and spare tire of the vehicle.

11.   Further inspection of the vehicle resulted in the discovery of packages in the spare tire with blue M30 pills. A sample from one of the 400 packages concealed within the spare tire field-tested positive for fentanyl, and the total weight of those packages was approximately 45.18 kilograms. The gas tank and rear seats contained 118 packages with a crystal-like substance, a sample of which field-tested positive for methamphetamine. The total weight of the 118 packages was 69.66 kilograms.

1    12.    Post-*Miranda*, PIMENTEL stated, in summary, that he did not know about the

2  drugs found in his vehicle. He said, among other things, he had been offered drug-smuggling

3  work before but declined, and he named several individuals with whom he had been in

4  contact regarding those offers.

5    13.    PIMENTEL was arrested and charged with a violation of Title 21, United

6  States Code, 952 and 960, importation of a controlled substance.

7    14.    During a search incident to arrest, agents seized an Apple iPhone 13 cellular

8  phone (the "subject phone") in PIMENTEL's possession. During his post-*Miranda*

9  interview, PIMENTEL was shown the subject phone, and he identified it as having belonged

10  to his partner's daughter but noted that he had it with him and his partner frequently calls

11  him on the phone. He consented to a search of it.

12    15.    A subpoena has been served on T-Mobile for the phone number associated

13  with the subject phone: 702-931-0630. Based on a review of the returns, PIMENTEL was

14  the subscriber for the subject account between approximately January 14, 2022 and April

15  18, 2022.

16    16.    A review of the download of the subject phone shows that was associated with

17  Apple ID **gil.pimentel0215@icloud.com**—the Subject Account. While there are limited

18  messages available on the subject phone, one message, sent by the user of this phone on

19  January 26, 2022, asks, in summary, whether the sender's cousin is a drug dealer and

20  suspects the cousin is ("…mi primo es narco? Se le ve que si"). During his post-*Miranda*

21  statement, the subject phone received multiple calls from a number of an individual

22  PIMENTEL identified as a "friend". The download of the phone shows approximately 18

23  missed calls from that individual on the day of PIMENTEL's arrest. No earlier calls (from

24  that or any other number) are available from the download, but based on a review of the

25  tolls for the subject account, there were nine calls between it and that individual's number

26  in the approximately 12 hours before PIMENTEL's crossing here, and approximately 25

27  consecutive calls or attempted calls around or shortly after the time of PIMENTEL's arrest.

28

17.     Based on all of these facts, and my training and experience, I believe PIMENTEL was using the subject phone and the Subject Account to further illegal narcotics activities, including the importation of fentanyl and methamphetamine on January 31. Moreover, given the difference in at least call data between the phone download and T-Mobile tolls for the phone number associated with this phone, I believe additional information regarding PIMENTEL's use of the phone and Subject Account exists and contains evidence of PIMENTEL's and others' violations of law, as set forth herein and in Attachment B.

18.     Based on my review of PIMENTEL's crossing history, he began crossing the vehicle on December 1, 2021. Other than one occasion on January 9, 2022 (when PIMENTEL crossed with someone believed to be the mother of an individual PIMENTEL believed is involved in drug trafficking, per his post-arrest statements), PIMENTEL was the only person who crossed in the vehicle leading up to the date of his arrest, and the vehicle had no crossings before December 1, 2021.

19.     Based on my training experience, I am aware that individuals engaged in drug trafficking often change phones and phone numbers. I am also aware that they may use account information, such as an Apple ID, from one phone and import it onto a new phone. Thus, although T-Mobile records show that PIMENTEL was the subscriber for the phone number associated with this phone as of January 14, 2022, I believe he was engaged in drug-trafficking activities well before that time, and there is probable cause to believe he was using the Subject Account in conjunction and in furtherance of these illegal activities. Moreover, as discussed below, I believe the evidence sought through this warrant may be found in the Subject iCloud Account. Accordingly, and based on all the facts set forth above, I request permission to search the Subject Account for evidence as set forth in Attachment B for the time period **December 1, 2021 to January 31, 2022.**

## GENUINE RISKS OF DESTRUCTION OF EVIDENCE

20.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be

5

1  permanently deleted or modified by users possessing basic computer skills. In this case,
2  agents believe there will be a genuine risk of destruction of evidence only if the subject
3  receives advance warning of the execution of this warrant.

## APPLE AND iCLOUD

5     21.     Apple is an Internet and electronics company that, among other things,
6  provides electronic communication services to its subscribers. It is a United States
7  company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS
8  operating system, and desktop and laptop computers based on the Mac OS operating
9  system. Apple provides a variety of services that can be accessed from Apple devices or,
10 in some cases, other devices via web browsers or mobile and desktop applications ("apps").
11 Apple's electronic mail service allows its subscribers to exchange electronic
12 communications with others through the Internet. Apple's subscribers access Apple's
13 services through the Internet. This and other information in this section is based in part on
14 information published by Apply on its website.

15     22.     Subscribers to or customers of Apple use screen names during
16 communications with others. The screen names may or may not identify the real name of
17 the person using a particular screen name. Although Apple requires users to subscribe for
18 a free Apple account, Apple does not verify the information provided by the subscriber for
19 its free services.

20     23.     At the creation of an Apple account and for each subsequent access to the
21 account, Apple logs the Internet Protocol ("IP") address of the computer accessing the
22 account. An IP address is a unique address through which a computer connects to the
23 Internet. IP addresses are leased to businesses and individuals by Internet Service
24 Providers. Obtaining the IP addresses that have accessed a particular Apple account often
25 identifies the Internet Service Provider that owns and has leased that address to its
26 customer. Subscriber information for that customer then can be obtained using appropriate
27 legal process.

28     24.     As described in further detail below, Apple's services include email,

6

messaging, and file storage:

        a.     Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

        b.     iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

        c.     iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and also can be used to store iOS device backups and data associated with third-party apps.

        d.     iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

        e.     Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.      Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g.      Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System (GPS) networks, and Bluetooth, to determine a user's approximate location.

h.      App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

i.      Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

j.      An Apple ID takes the form of the full email address submitted by the user to create the account; it later can be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address.  Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. Apple accounts can also be identified by means of the International Mobile Equipment Identification (IMEI) number of the Apple phone.

i.      Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal

8

1    information including the user's full name, physical address, and telephone numbers.  The

2    user may also provide means of payment for products offered by Apple. The subscriber

3    information and password associated with an Apple ID can be changed by the user through

4    the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures

5    the date on which the account was created, the length of service, records of log-in times

6    and durations, the types of service utilized, the status of the account (including whether the

7    account is inactive or closed), the methods used to connect to and utilize the account, the

8    Internet Protocol address ("IP address") used to register and access the account, and other

9    log files that reflect usage of the account.

10            j.       Additional information is captured by Apple in connection with the use

11   of an Apple ID to access certain services. For example, Apple maintains connection logs

12   with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes

13   Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on

14   Apple's website. Apple also maintains records reflecting a user's app purchases from App

15   Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for

16   iMessage, and "mail logs" for activity over an Apple-provided email account. Records

17   relating to the use of the Find My iPhone service, including connection logs and requests

18   to remotely lock or erase a device, are also maintained by Apple.

19            k.       Apple also maintains information about the devices associated with an

20   Apple ID.  When a user activates or upgrades an iOS device, Apple captures and retains

21   the user's IP address and identifiers such as the Integrated Circuit Card ID number

22   ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone

23   number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or

24   iMessage. Apple also may maintain records of other device identifiers, including the Media

25   Access Control address ("MAC address"), the unique device identifier ("UDID"), and the

26   serial number. In addition, information about a user's computer is captured when iTunes is

27   used on that computer to play content associated with an Apple ID, and information about

28   a user's web browser may be captured when used to access services through icloud.com

and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

l.      Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

25.   In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

26.   For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often

created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

27.   In   addition,   the   user's   account   activity,   logs,   stored   electronic communications, and other data retained by Apple can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify   which   computers   or   other   devices   were   used   to   access   the   account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

28.   Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the   account   may   indicate   the   owner's   motive   and   intent   to   commit   a   crime   (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

29.   Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. And emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

30.   Therefore,   Apple's   servers   are   likely   to   contain   stored   electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes

under investigation including information that can be used to identify the account's user or users.

## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

31.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics investigations, and all the facts and opinions set forth in the affidavit, I know that drug traffickers use mobile telephones, text messages, computers, third party communication applications and social networking sites which can be accessed through mobile telephones to communicate with one another. DTO members use cellular telephones and the private messaging features commonly found on them to communicate clandestinely with other members of the organization, to conceal specific information about the organization from law enforcement, and to store phone numbers, text messages, emails, photographs, physical and email addresses, and other information that constitutes evidence of their drug trafficking activities. DTO members also are known to use multiple social media platforms.

32.     Based on my training and experience, I also know that photographs and videos found on mobile telephones and the Subject Account can serve as circumstantial evidence of a perpetrator's guilt, insofar as, for example, the photographs or videos show the suspects wearing similar clothing to the clothing that they were wearing during the commission of a crime, or reveal, through location-tagging features, that an individual was present for a particular crime or event.

33.     DTO members use cellular telephones and other electronic devices with internet access to notify or warn their accomplices of law enforcement activity to include the presence and posture of U.S. and foreign law enforcement agents. Individuals involved in drug distribution and importation use cellular telephones and electronic communication devices to conduct their criminal activities. An examination of the Subject Account will enable investigators to establish further evidence of drug distribution and importation and of co-conspirators.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

34.    Aside from the download of the subject phone and subpoenaed phone tolls discussed above, the United States has not attempted to obtain the evidence sought through this warrant by other means.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

35.    Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Apple are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Apple for the relevant accounts and then to analyze the contents of those accounts on the premises of Apple. The impact on Apple's business would be disruptive and severe.

36.    Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the Apple account, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Apple, to protect the privacy of Apple subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, HSI seeks authorization to allow Apple to make a digital copy of the entire contents of the account(s) subject to seizure.  That copy will be provided to me or to any authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

37.    Analyzing the data to be provided by Apple may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process. Keyword

13

searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database, and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.   36.   ISPs do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

38.   Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by Apple, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within **90 days** of receipt of the data from the service provider, absent further application to this Court.

39.   Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

40.   All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

//

//

//

14

# CONCLUSION

41.    Based on the forgoing, I request that the Court issue the proposed search warrant for Subject Account, as described in Attachment A, for evidence as outlined in Attachment B.

*Richard Horrocks*
_____
Richard Horrocks
Special Agent
Homeland Security Investigations


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 3rd day of June, 2022.

_____
The Honorable Michael S. Berg
United States Magistrate Judge

15

## ATTACHMENT A

### Property to Be Searched

Apple Inc. is an internet service provider with its primary computer information systems and other electronic communications and storage systems, records, and data located at One Apple Park Way, Cupertino, California 95014.

Apple hosts the following electronic communication accounts that are the subject of this search warrant and application: **gil.pimentel0215@icloud.com** (the "Subject Account").

1

**ATTACHMENT B**

**Particular Items to be Seized**

**I.     Service of the Warrant**

The officer executing the warrant shall permit Apple, as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**II.    Items To Be Provided by Apple**

All subscriber and/or user information and content, including all SMS or text messages, iMessages, phone and FaceTime call logs, third-party application data, iCloud content and data, keybag and FileInfoList.txt files, and iCloud device backup data, electronic mail, images, videos, histories, VoIP logs, contacts or friend lists, profiles, method of payment, detailed billing records, access logs, backup data, transactional data, and any other files or records associated with the following account: **gil.pimentel0215@icloud.com** (the "Subject Account").

**III.   Search and Items To Be Seized by the Government**

The search of the data supplied by Apple pursuant to this warrant will be conducted by HSI as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of **December 1, 2021 to January 31, 2022** and to the seizure of:

    a.  Communications, records, and attachments tending to discuss or establish the importation of or conspiracy to import fentanyl, methamphetamine, or other controlled substances, or the distribution of or conspiracy to distribute controlled substances;

    b.  Logs, images, videos, application data, iCloud data, histories, contact or friend lists, profiles, payment and billing records, backup and transactional data, and any other communications, records, and attachments, tending to discuss or establish the importation of or conspiracy to import fentanyl, methamphetamine, or other controlled

1

1   substances, or the distribution of or conspiracy to distribute controlled

2   substances;

3       c.   Communications, records, and attachments tending to identify any co-

4   conspirators involved in the activities in III(a) and (b) above; and

5       d.   Communications, records, and attachments that provide context to any

6   communications described above, such as messages or electronic mail

7   sent or received in temporal proximity to any relevant message or

8   electronic mail and any message or electronic mail tending to identify

9   users of the subject accounts;

10   which are evidence of violations of 21 U.S.C. § 952, 960, and 963.

2